UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM E. BROWN,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>R. AMIS, et al.,<br><br>　　　　Defendants. | Case No. 16-cv-00603-HSG<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 74 |

Plaintiff filed this *pro se* action pursuant to 42 U.S.C. § 1983 regarding events that transpired at Pelican Bay State Prison ("PBSP"), where he was previously incarcerated. Now pending before the Court is defendants' motion for summary judgment. Dkt. No. 74. Plaintiff received a three-month extension of time to file his opposition (Dkt. No. 77), but has filed no opposition and the deadline to do so has passed. For the reasons set forth below, the Court GRANTS defendants' motion for summary judgment.

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise indicated.[1]

---

[1] On summary judgment, the nonmoving party must identify with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the district court's responsibility to scour the record in search of a genuine issue of triable fact. *Id.* Accordingly, in determining whether defendants' version of the facts is disputed, the Court has only considered the amended complaint and has not considered plaintiff's numerous other pleadings, which consist of unsupported allegations or concern matters unrelated to the remaining cognizable claims. *See, e.g.*, Dkt. No. 36 (alleging that prison officials are showing implicit racial bias and harassing him by refusing to recognize K.A.G.E. religious activity group, in violation of Thirteenth Amendment); Dkt. No. 50 (requesting that the Court take judicial notice of the Green Wall Author and that administrative remedies were effectively unavailable to him); Dkt. No. 51 (motion requesting judicial notice that he is eligible for parole pursuant to Proposition 57); Dkt. No. 57 (declaration by plaintiff that he is being falsely imprisoned, that prison officials have concealed emails, and that he is being subject to involuntary servitude and Green Wall Corporate Malfeasance).

PBSP is a maximum security or "super max" prison. Dkt. No. 74-1 ("Amis Decl.") at ¶ 2. Under the level of security in place at PBSP, inmates are watched and subject to search when they move between buildings. Amis Decl., at ¶ 2; Dkt. No. 74-2 ("Espinoza Decl."), at ¶ 2. Searches are intended to detect different types of contraband, and to enforce the rule that inmates may not pass, loan, or convey personal property amongst themselves. Amis Decl., at ¶ 2; Espinoza Decl., at ¶ 2. Because there are a number of illicit activities that involve the use of paper, paper is scrutinized as a possible threat to maintaining institutional security. Amis Decl., at ¶ 3; Espinoza Decl., at ¶ 2. Paper can support illicit activities in the following ways. Gambling is prohibited in prison and inmates engaged in gambling may record gambling activities and gambling debts on paper. Drug debts are recorded on paper. Pornography is prohibited but paper pornography may be passed among inmates. Inmates may also pass paper notes, known as "kites," to organize prohibited activities, such as attacks on other inmates, the importation of drugs and other contraband into the institution, gang activities, or attacks on staff. Amis Decl., at ¶ 3; Espinoza Decl., at ¶ 2.

### A. Inmate Leisure Time Activity Groups and Religious Groups at PBSP

PBSP inmates may participate in Inmate Leisure Time Activity Groups ("ILTAGs"). Amis Decl., at ¶ 5. ILTAGs are not the same as religious groups involving the practice of faith. ILTAGs include self-help groups, such as Alcoholics Anonymous or anger management groups; study groups; or art classes. Amis Decl., at ¶ 5.

During the relevant time period, defendant Losacco served as PBSP Community Resources Manager. Losacco Decl., at ¶ 2. In this role, defendant Losacco facilitates inmates' leisure time activities and religious activities. Defendant Losacco's responsibilities include finding sponsors or chaplains to oversee the religious and activity groups and arranging for the groups' use of prison facilities and resources. Losacco Decl., at ¶ 2. The prison chapel is one of the primary facilities and resources for both religious groups and ILTAGs and is in great demand because groups can gather there for religious services or meetings. Losacco Decl., at ¶ 2. Use of the chapel is allocated pursuant to a variety of considerations, such as the specific day of worship required by a particular religion, the amount of time required for any one service, and the number

of inmates served by a particular faith. Losacco Decl., at ¶ 2. In determining how to allocate PBSP's limited resources, including use of the chapel, preference is given to those groups that serve the largest number of inmates. Losacco Decl., at ¶ 13.

There have been instances where inmates have sought to use the chapel for purposes that have nothing to do with faith or other legitimate activities because they can meet there with minimal supervision. Losacco Decl., at ¶ 3. These purposes may be contrary to the safety and security of the institutional and individual inmates and staff. Losacco Decl., at ¶ 3. Such misuse of the facilities threatens institutional security and impedes the ability of other inmates to practice their religious beliefs. Losacco Decl., at ¶ 3.

In order to ensure that the chapel is used for legitimate purposes, PBSP requires inmates seeking to use the chapel to submit a request containing certain information. Losacco Decl., at ¶ 4. Proposed religious groups must submit (1) a letter of intent from the inmate who proposes to be the group's minister, (2) a copy of the group's principles or by-laws; and (3) a list of current group members or a list of inmates interested in becoming members. Losacco Decl., at ¶ 4. Activity groups are typically asked to provide a copy of their principles or by-laws. Losacco Decl., at ¶ 4. All groups require a sponsor. Losacco Decl., at ¶ 5. The sponsor will ensure that inmate group members receive a ducat (pass) to attend meetings and that facilities are available for meeting, and will attend any meeting of the group. Losacco Decl., at ¶ 5. There are a limited number of sponsors, and sponsor availability is further limited by the interests and knowledge of the sponsor and how well that aligns with any particular activity group. Losacco Decl., at ¶ 5. Religious groups are typically sponsored by the prison's chaplains. Losacco Decl., at ¶ 5. Activity group sponsors may be CDCR employees who are willing to volunteer to work with a group. Losacco Decl., at ¶ 5. Volunteers from outside the prison may sponsor activity groups but must still be supervised by prison staff. Losacco Decl., at ¶ 5.

**B.  K.A.G.E. Religion and P.E.A.C.E. Group**

Plaintiff is a minister affiliated with the religious group, United Kings Against Genocidal Environments ("K.A.G.E.") which invokes the Kemetic Aztec Gnostic Earth universal ideologies. Dkt. No. 25 at 14. Plaintiff claims that in granting Grievance No. PBSP-14-2313 PBSP

3

recognized K.A.G.E. as a religious group and granted it the right to religious assembly. Dkt. No. 25 at 14. However, this claim is contradicted by the plain language of the second level response to Grievance No. PBSP-14-2313. In Grievance No. PBSP-14-2313, plaintiff alleged that he was unable to practice his truly held religious belief, the K.A.G.E. religion and sought to hold K.A.G.E. religious services on A Facility. Dkt. No. 74-3 at 12. On October 14, 2014, Grievance No. PBSP-14-2313 was partially granted at the second level of review and clearly stated that plaintiff had not yet taken the steps to form a religious group named K.A.G.E:

- Inmate Brown's request to allow United Kings against Genocidal Environments (KAGE) Brothers religious services on A Facility is PARTIALLY GRANTED at the Second Level Review. **When the necessary steps to form a religious group have been met**, PBSP will make every effort to provided [sic] religious accommodations.

- Inmate Brown's request to [sic] United KAGE Brothers the use of PBSP facilities to conduct meetings and to meet with outside groups is PARTIALLY GRANTED at the Second Level Review. **When the necessary steps to form a religious group have been met**, PBSP will make every effort to provided [sic] religious accommodations.

Dkt. No. 74-3 at 12-13 (emphasis added). When plaintiff originally proposed forming a group called K.A.G.E., he clearly identified it as a self-help or study group. Although he stated that K.A.G.E. would incorporate spiritual and religious principles, he did not identify the group as a religious group. Specifically, on or about September 2, 2014, plaintiff submitted a document titled "Proposal for GP group with volunteer staff," requesting approval for a group named the "United K.a.g.e. Brothers Study Group." Dkt. No. 74-3 at 7-8. In his proposal, plaintiff stated that he sought "(101060.6.2) to be an inmate assistant and to be (101060.6.3) used as an inmate Minister – to mentor or guide this group – self help purpose (101060.2)." Dkt. No. 74-3 at 7 (parentheticals in original). The self-help group's focal points were described as follows:

> U.K.B.-Mentors is dedicated to the propagation of the universal teachings of spiritual evolution which relate to the union of humanity and the union of all things within the universe. U.K.B.-Mentors is a nondenominational program which recognizes the unifying principles in all spiritual and religious systems of evolution throughout the world. Our primary goals are to provide the wisdom of spiritual teachings in books, courses, and other donated forms of communication provided by volunteers or non-profit organizations.
>
> Secondly: to provide instruction and training in the various yogic philosophy, Christian Gnosticism, Indian philosophy, ancient Egyptian philosophy, and modern science. A primary focus of our tradition is to identify and acknowledge the yogic philosophies within all religions and relate them to each other in order to promote their deeper

4

> understanding; to practice mental, physical, and spiritual disciplines that lead to self-control and self discovery by purifying the mind, body, and spirit so as to discover the deeper spiritual essence which lies within every human being and object in the universe.
>
> U.K.B.-mentors provide a moral guideline for understanding the externalized movements and desires of the mind that keep the conscious (sic) self distracted with wordly (sic) pursuits. In order to engender a real transformation in the conscious level of the mind, the unconscious level of the mind must be transformed. This is the level of the mind in which anyone can exert their control over their mental thoughts. U.K.B.-Self Help is a cast philosophy of spiritual life which encompasses several spiritual disciplines to aid a person the struggle of life and discovering their higher self. U.K.B. endows the individual with a deep insight into the nature of the mind by experiencing its transcendental levels.

Dkt. No. 74-3 at 7-8. The by-laws filed with the request described U.K.B. as a study group/mentor program; listed group activities as reading books from the Lionheart Press's life skills studies; described the group as incorporating a mentorship program whereby members would mentor youth about how to avoid prison; and also described the group as a step program with members graduating from each step by completing certain "remedial" requirements. Dkt. No. 74-3 at 9-10. The only inmate listed as a member of U.K.B. or interested in U.K.B. was plaintiff. Losacco Decl., at ¶ 9.

Upon receiving plaintiff's request to form this group, defendant Losacco rejected the group's proposed name, which stood for "Kings Against Genocidal Environments." Losacco Decl., at ¶ 7.

Plaintiff claims that defendant Losacco rejected the name because the group's name and ideology advocated "'new Afrikan' political ideology and activism as a political prisoner via the 2011-2013 United K.A.G.E. Brothers Demands." Dkt. No. 25 at 14, 16. Plaintiff claims that defendant Losacco informed plaintiff, "As long as I have the means and the ability, you will not be allowed to use the acronym K.A.G.E. to represent a religious, a self-help group or a leisure time activity group" and refused to allow K.A.G.E. to assemble unless the group changed its religious ideology and name. Dkt. No. 25 at 14, 16.

Defendant Losacco claims he rejected the name for the study group for the following reasons. First, allowing a few select inmates to refer to themselves as "kings," could lead to confrontation and physical harm, especially at PBSP, where the populations can be aggressive. Second, the name suggested that PBSP was a genocidal environment, which it was not, and it

5

would be detrimental to PBSP to allow inmates to refer to it as such with the ostensible approval of the institution. Losacco Decl., at ¶ 7.

Plaintiff proposed alternate names, such as Kings Anti-Hostility and Godly Environments and Kenec Aztec Gnostic Earth, but all the names retained the acronym K.A.G.E. Losacco Decl., at ¶ 8. Defendant Losacco also informed plaintiff that if plaintiff was the only inmate interested in participating in K.A.G.E., this would be insufficient to form a group. Losacco Decl., at ¶ 9. Plaintiff then submitted a list with names of approximately half a dozen other inmates, but when Losacco contacted those inmates, none of those inmates had any idea they were on the list and these inmates expressed a desire to have nothing to do with Brown. Losacco Decl., at ¶ 9.

Plaintiff eventually succeeded in forming a group with other inmates, which was named the Prisoners Embracing Anti-Hostilities Cultural Education ("P.E.A.C.E.") group. Losacco Decl., at ¶ 10. The P.E.A.C.E. group's purpose was to foster a decrease in hostility between various factions of the prison population through activities that crossed the boundaries that usually divided that population, such as race, gang affiliation, or religious background. Losacco Decl., at ¶ 10. Losacco heard from P.E.A.C.E. members that once the P.E.A.C.E. group was up and running, plaintiff began advocating changes, including changing the name to K.A.G.E. and changing the P.E.A.C.E. group's focus to challenging what plaintiff felt were oppressive aspects of PBSP. Losacco Decl., at ¶ 11. The other P.E.A.C.E. members rejected plaintiff's suggestions and when the P.E.A.C.E. group elected its five officers, plaintiff was not one of them. Losacco Decl., at ¶ 11.

While the P.E.A.C.E. group was being formed, plaintiff requested that he be allowed to form a religious group which he called K.A.G.E. Losacco Decl., at ¶ 12. On October 19, 2014, plaintiff filed a CDCR Form 22 requesting instructions on how to form a "peace self-help / religious activity group." Dkt. No. 74-3 at 15. On October 21, 2014, defendant Losacco responded that plaintiff should provide a list of inmates wishing to worship and a letter of intent from the inmate intending to be the minister. Dkt. No. 74-3 at 15. Plaintiff did not pursue this request beyond the discussion stage, and never submitted either a letter of intent to form a religion called K.A.G.E. or a list of inmates who would be members of the proposed K.A.G.E. religious

1  group. Losacco Decl., at ¶ 12.

**C.     January 13, 2015 Events**

The only interactions that defendants Amis and Espinoza had with plaintiff was on January 13, 2015.

According to plaintiff, on January 13, 2015, Chaplain Alex Valuiski permitted a religious activity group, of which plaintiff is a member, to assemble in Facility A Chapel. Defendants agree that, on that date, P.E.A.C.E., an ILTAG group of which plaintiff is a member, was scheduled to assemble in Facility A Chapel. However, defendants identify P.E.A.C.E. as an ILTAG and not as a religious group. Amis Decl., at ¶ 5.

That evening, the only activity taking place at the PBSP Facility A chapel were ILTAG meetings, including a P.E.A.C.E. meeting. Amis Decl., at ¶ 5; Espinoza Decl., at ¶ 3. Inmates going between the housing units and chapel must pass the program office and are monitored by correctional officers assigned to "search and escort" (S and E) duty. Amis Decl., at ¶ 4. An inmate must present a valid ducat (a permission slip or "hall pass" inmates are issued when they need to attend medical appointments, religious services or other activities which are not part of their usual daily programming) to the S and E officer before he can proceed, and the inmate is subject to search. Amis Decl., at ¶ 4. That evening, defendant Amis was working in his office, which is located in the program office, and defendant Espinoza was working as a S and E officer screening inmates passing between the housing units and the chapel. Amis Decl., at ¶ 5; Espinoza Decl., at ¶ 3. Plaintiff arrived in the chapel area that evening with a valid ducat to attend P.E.A.C.E. Amis Decl., at ¶ 5; Espinoza Decl., at ¶ 3. Plaintiff was carrying a large sheaf of papers, nearly three inches high. Amis Decl., at ¶ 6; Espinoza Decl., at ¶ 3. Plaintiff describes this stack of papers "'authorized' and necessary materials related to Plaintiff's religious practice/belief." Dkt. No. 25 at 8. Both defendants Espinoza and Amis state that the documents did not appear to be religious in any way. Espinoza Decl., at ¶¶ 4, 7; Amis Decl., at ¶¶ 6, 7.[2]

---

[2] Defendant Espinoza describes the documents as "a mixture of different items [that] did not appear to be of a religious nature." Espinoza Decl., at ¶ 4. Defendant Espinoza recalled one item in particular: a hand drawn image of a face with large gold teeth. Espinoza Decl., at ¶ 4. Defendant Amis describes the documents as "an odd collection of disparate items, none of which

7

Plaintiff was stopped in front of the program office by defendant Espinoza, who verified plaintiff's identification and conducted a clothed pat-down search. Espinoza Decl., at ¶ 3. Defendant Espinoza began to inspect plaintiff's papers. Espinoza Decl., at ¶ 4. Because the documents were voluminous and there were a number of other inmates waiting to be cleared to attend ILTAG activities, defendant Amis stepped forward to conduct the review. Amis Decl., at ¶ 6; Espinoza Decl., at ¶ 5. Defendant Amis decided that because ILTAG activities are minimally supervised and there are security concerns surrounding paper, he would not allow plaintiff to take the documents to his meeting and would retain them for a further security review. Amis Decl., at ¶ 6; Espinoza Decl., at ¶ 4. Defendant Amis issued plaintiff a receipt for his documents and, to the best of defendant Amis's recollection, these documents were later returned to plaintiff by an S and E officer. Amis Decl., at ¶ 6; Espinoza Decl., at ¶ 4. Plaintiff chose not to attend the meeting and instead returned to his cell. Espinoza Decl., ¶ 5.

On December 7, 2015, plaintiff filed a CDCR Form 22, complaining that PBSP was denying the United K.A.G.E. Brothers Peace Group access to the chapel. Dkt. No. 74-3 at 17. On December 29, 2015, Warden Ducart stated that records indicated that neither plaintiff nor the United K.A.G.E. Brothers Peace Group had ever been granted time to gather in B Chapel, that the United K.A.G.E. Brothers Peace Group was not a recognized PBSP ILTAG or a recognized PBSP religion; that the United K.A.G.E. Brothers Peace Group was separate from P.E.A.C.E., a recognized ILTAG; and that if plaintiff wished for the United K.A.G.E. Brothers Peace Group to be recognized as either an ILTAG or religious group, he would need to follow the appropriate process for recognition. Dkt. No. 74-3 at 17.

**DISCUSSION**

**I.     Summary Judgment Standard**

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

bore any apparent relation to the activity or group [plaintiff] was attending." Amis Decl., at ¶ 6. While defendant Amis cannot recall every document, he recalls papers regarding semen donation and a hunger strike. Amis Decl., at ¶ 6.

8

law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). However, in order to show that a genuine issue of material fact exists, the nonmoving party must introduce some "significant probative evidence tending to support the complaint." *Anderson*, 477 U.S. at 249. "'The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Anderson*, 477 U.S. at 247–48). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts

9

1 for purposes of ruling on a motion for summary judgment." *Id.*

## II. Analysis

### A. P.E.A.C.E. and K.A.G.E.

For purposes of deciding this motion, the Court presumes that Kings Against Genocidal Environments is a religion. However, the Court finds that there is no triable issue of fact as to whether plaintiff submitted a request to prison officials to form a religious group based on the K.A.G.E. religion. The only request to form a group submitted by plaintiff to prison officials was his September 2, 2014 request to form the "Kings Against Genocidal Environments" (K.A.G.E.) study group, which plaintiff clearly identified as a self-help or study group and did not identify as a religious group. The fact that the group studied or incorporated religious materials did not make the group a religious group and, more importantly, did not alert prison officials that the proposed K.A.G.E. study group should be considered a religious group rather than an activity group. The distinction between the K.A.G.E. ILTAG, which eventually was approved as the P.E.A.C.E. ILTAG, and plaintiff's potential K.A.G.E. religious group is important because prison officials' restrictions on an ILTAG would not implicate either the First Amendment's free exercise clause or Establishment Clause. While a Court must view the facts in the light most favorable to the non-moving party at the summary judgment stage, the Court may not adopt a version of the facts that is blatantly contradicted by the record, as is the case here with respect to plaintiff's allegation that PBSP approved his religious group K.A.G.E. *Scott*, 550 U.S. at 380. Keeping in mind the distinction between the K.AG.E./P.E.A.C.E. ILTAG that was approved by PBSP and plaintiff's proposed K.A.G.E. religious group, the Court now turns to defendants' summary judgment motion.

### B. Defendant Losacco

Plaintiff argues that defendant Losacco violated his First Amendment right to free exercise of religion, violated the First Amendment's establishment clause, and violated the Equal Protection Clause when he (1) instructed correctional staff that plaintiff's group, United Kings against Genocidal Environments, could not meet unless the group changed its religious ideology and changed its name to "Prisoners Embracing Anti-Hostilities Cultural Education" (P.E.A.C.E.);

10

2 (2) denied plaintiff's group the right to assemble because of its name and because it advocated new Afrikan political ideology; and (3) refused to allow plaintiff to use the acronym KAGE as the name for a religious, self-help, or leisure time activity group. Dkt. No. 25 at 14-16.

### 1) First Amendment Right to Free Exercise of Religion

Defendants argue that defendant Losacco did not violate plaintiff's First Amendment right to free exercise because (1) defendant Losacco's actions were solely concerned with resource allocation and neither prohibited or endorsed any practice of religion, and (2) defendant Losacco's actions, including the refusal to allow plaintiff to name his group Kings Against Genocidal Environments or use the acronym KAGE, were justified by legitimate penological interests.

In order to establish a free exercise violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008). A prisoner is not required to objectively show that a central tenet of his faith is burdened by a prison regulation to raise a viable claim under the Free Exercise Clause. *Id.* at 884-85. Rather, the sincerity test, which asks whether the prisoner's belief is "sincerely held" and "rooted in religious belief," determines whether the Free Exercise Clause applies. *Id.* (finding district court impermissibly focused on whether consuming Halal meat is required of Muslims as a central tenet of Islam, rather than on whether plaintiff sincerely believed eating kosher meat is consistent with his faith). The prisoner must show that the religious practice at issue satisfies two criteria: (1) the proffered belief must be sincerely held and (2) the claim must be rooted in religious belief, not in purely secular philosophical concerns. *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (cited with approval in *Shakur*, 514 F.3d at 884). A prison regulation that impinges on an inmate's First Amendment rights is valid if it is reasonably related to legitimate penological interests. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). The Supreme Court has identified four factors to consider when determining the reasonableness of a prison rule: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the

11

asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally;" and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." *Turner*, 482 U.S. at 89-90.

The Court finds that defendant Losacco is entitled to summary judgment with respect to the free exercise claim because defendant Losacco's actions only impacted the K.A.G.E./P.E.A.C.E ILTAG. Placing restrictions on what an ILTAG can be named does not burden the practice of a religion.

To the extent that plaintiff's potential religious group K.A.G.E. was not allowed to use the chapel for assembly, it was due to plaintiff's failure to complete the process for having his religious group formally recognized. There is a valid, rational connection between prison security and fair allocation of resources and the requirement that inmates seeking to use the chapel submit a request containing certain basic information. This requirement allows prison officials to determine if the group is seeking to use the chapel for legitimate activities and to determine how many inmates will be served by the group. Accommodating plaintiff's request for use of the chapel without first submitting the requested information could lead to an inequitable distribution of chapel access, and could allow for the chapel to be used for illegitimate activities which would threaten prison security and inmate and staff safety. The requirement was not an exaggerated response to prison concerns. There was no need for an alternative means of exercising plaintiff's right to practice the K.A.G.E. religion because there is no allegation that the requirement that plaintiff submit certain information regarding his group burdened the practice of his religion.

Assuming arguendo that plaintiff's K.A.G.E. religion required that his religious group be named "Kings Against Genocidal Environments" and/or use the acronym K.A.G.E., defendant Losacco's prohibition on that name and that acronym had a valid, rational connection to prison security because the name implies that PBSP is a cage or genocidal environment. Allowing a group with such a name plausibly could encourage greater aggressiveness in the prison population, which could negatively affect prison security and require more correctional officials to ensure prison security. The prohibition on that name and that acronym was not an exaggerated response to prison concerns. In considering whether plaintiff had alternative means of practicing the

12

K.A.G.E. religion if he could not form a religious group with the name "Kings Against Genocidal Environments" and the acronym K.A.G.E., the Court considers whether plaintiff was deprived of "all means of expression." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351–52 (1987) (prison officials not constitutionally required to sacrifice legitimate penological objectives to ensure that every Muslim prisoner able to attend Jumu'ah; *Turner* analysis should examine whether the Muslim inmates were deprived of "all means of [religious] expression"). There is no allegation that forming the K.A.G.E. religious group with a different name, such as Kenec Aztec Gnostic Earth, would deprive plaintiff of all means of religious expression with respect to the K.A.G.E. faith. In addition, plaintiff has not shown how the requirement that the K.A.G.E. religious group be named "Kings Against Genocidal Environments" and/or use the acronym K.A.G.E. is rooted in religious belief.

Accordingly, the Court GRANTS summary judgment in favor of defendant Losacco on the First Amendment free exercise claim.

**2) Establishment Clause**

Defendants argue that defendant Losacco did not violate plaintiff's rights under the Establishment Clause because PBSP's facility and resource use policies have the secular purpose of orderly distribution of prisoner resources amongst all inmates, regardless of whether the resource will be used for religious or non-religious purposes; do not advance or inhibit religion because their intent is to ensure that inmates who want or need prison resources have access to them, regardless of whether the resource will be used for religious or non-religious purposes; and do not foster excessive entanglement with religion because the policies only address scheduling use of facilities and use of resources without reference to the religious or non-religious nature of that use. Dkt. No. 74 at 16-17.

The Supreme Court has interpreted the Establishment Clause to mean that the government may not promote or affiliate itself with any religious doctrine or organization and may not discriminate among persons on the basis of their religious beliefs and practices. *See Cty. of Allegheny v. ACLU*, 492 U.S. 573, 590 (1989). For the purpose of an Establishment Clause violation, a state policy need not be formal, written or approved by an official body to qualify as

13

state sponsorship of religion; however, the actions complained of must be sufficiently imbued with the state's authority to constitute state endorsement of religion. *See Canell v. Lightner*, 143 F.3d 1210, 1214-15 (9th Cir. 1998) (correctional officer's evangelizing activities did not constitute state endorsement of religion because activities were not sanctioned in any way by policy of correctional facility or staff and were short-term and sporadic). The Establishment Clause requires prison officials to use neutral criteria in deciding how to allocate resources among different prison religious groups so they do not end up endorsing one religion over another. *See Hartman v. Calif. Dep't of Corr.*, 707 F.3d 1114, 1126 (finding that plaintiff stated an Establishment Clause claim where prison officials had created staff chaplain positions for five conventional faiths but failed to use neutral criteria in deciding whether a growing minority religion warranted a reallocation of resources). A state regulation or practice "does not violate the Establishment Clause if (1) the enactment has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not foster an excessive entanglement with religion." *Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759, 762 (9th Cir.) (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)), *cert. denied*, 454 U.S. 863 (1981).

The Court finds that defendant Losacco is entitled to summary judgment with respect to the Establishment Clause claim because defendant Losacco's actions only impacted the K.A.G.E./P.E.A.C.E ILTAG. Placing restrictions on an ILTAG neither advances or inhibits the practice of a religion.

As discussed *supra*, to the extent that plaintiff's potential religious group K.A.G.E. was not allowed to use the chapel for assembly, it was due to plaintiff's failure to complete the process for having his religious group formally recognized. The requirement that inmates seeking to use the chapel submit a request containing certain basic information has the secular purpose of ensuring prison security and of equitably distributing access to the chapel. Plaintiff has not provided any evidence from which it can be reasonably inferred that the information required to establish a religious group inhibited his religion or constituted an excessive entanglement with religion.

Assuming arguendo that plaintiff's K.A.G.E. religion required that his religious group be named "Kings Against Genocidal Environments" and/or use the acronym K.A.G.E., defendant

14

Losacco's prohibition on that name and that acronym has the secular purpose of ensuring prison security, and plaintiff has not provided any evidence from which it can be reasonably inferred that (1) the inability to use the word genocidal or the acronym KAGE in his potential religious group's name inhibited his religion or that (2) these particular restrictions on word choice and acronym constituted an excessive entanglement with religion.

Accordingly, the Court GRANTS summary judgment in favor of defendant Losacco on the Establishment Clause claim.

### 3) Equal Protection Clause

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The only proper standard for determining the validity of a prison regulation or practice claimed to infringe on an inmate's constitutional rights is to ask whether the regulation or practice is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. A plaintiff alleging denial of equal protection under 42 U.S.C. § 1983 based on race or other suspect classification must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent. *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998). To state a claim for relief, the plaintiff must allege that the defendant state actor acted at least in part because of plaintiff's membership in a protected class. *See Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013). To avoid summary judgment on an Equal Protection Claim, a plaintiff must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the decision was motivated by discriminatory intent. *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003).

Defendants argue that defendant Losacco did not violate plaintiff's rights under the Equal Protection Clause because defendant Losacco did not act with discriminatory intent in that defendant Losacco never denied a request by plaintiff to form a religious group and only denied an incomplete request submitted by plaintiff, and because defendant Losacco only required plaintiff

15

to provide the same information provided by other inmates seeking to form religious group. The Court agrees. It is undisputed that plaintiff initially identified the "Kings Against Genocidal Environments" as a study group, not as a religious group, and that PBSP ultimately approved the group with the name P.E.A.C.E. It is also undisputed that plaintiff never submitted a complete request to form a religious group. Moreover, the requirement that plaintiff submit certain basic information to form the K.A.G.E. religious group was applied to inmates of all religious faiths. To the extent that plaintiff alleges that defendant Losacco violated the Equal Protection Clause by refusing to allow a religious group named "Kings Against Genocidal Environments" and/or use the acronym K.A.G.E., plaintiff has failed to introduce significant probative evidence that the refusal was motivated by discriminatory intent or that the refusal was not reasonably related to legitimate penological interests. As discussed *supra*, defendant Losacco refused to allow a group, whether religious or an ILTAG, to use the name "Kings Against Genocidal Environments" or use the acronym K.A.G.E. because of the legitimate penological interest of prison security. Plaintiff has not produced evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that defendant Losacco's actions was motivated by discriminatory intent.

Accordingly, the Court GRANTS summary judgment in favor of defendant Losacco on the equal protection claim.

**C.     Defendants Amos and Espinoza**

Defendants argue that defendants Amos and Espinoza are entitled to summary judgment because they did not violate plaintiff's First or Fourteenth Amendment rights by searching plaintiff's papers and confiscating them for further review.

**1)     First Amendment Right to Free Exercise of Religion**

Defendants argue that defendants Amos and Espinoza did not violate plaintiff's First Amendment right to free exercise because their actions were justified by legitimate penological interests. Specifically, they argue the following: (1) given the widespread use of paper for illicit activities, there is a valid, rational connection between reviewing plaintiff's documents and prison security; (2) there was an alternate means of exercising plaintiff's right to religion because his documents were only confiscated for the duration of the meeting and the meeting was for a self-

16

help group, not a religious group; (3) the search and confiscation only affected plaintiff and did not affect prison personnel, other inmates, and prison resources, whereas allowing kites and contraband to go undetected would have negatively impacted inmates and correctional staff; and (4) the minimal deprivation of access to allegedly religious documents while they were reviewed for security purposes was not an exaggerated response to prison concerns.

Assuming arguendo that the documents were religious in nature, the Court agrees that defendants Amos and Espinoza did not violate plaintiff's First Amendment right to free exercise because their actions were justified by legitimate penological interests.

There is a valid, rational connection between reviewing a three-inch stack of documents and prison security. As explained *supra*, paper can be used to facilitate various illicit activities that may negatively impact prison security and inmate and staff safety. Allowing papers to go unsearched could negatively impact prison security and inmate and staff safety. The review of plaintiff's documents was therefore not an exaggerated response to prison concerns. Plaintiff has not presented any "significantly probative evidence" that review of his documents deprived him of all means of religious expression.

There is also a valid, rational connection between temporarily confiscating a three-inch stack of documents for in-depth review and both prison security and allowing inmates to be processed quickly so that they could attend their ILTAG. Reviewing plaintiff's documents on the spot would negatively impact other inmates who would be delayed in attending their ILTAGs; and the brief confiscation of plaintiff's documents was not an exaggerated response to prison concerns. Plaintiff has not presented any "significantly probative evidence" that the confiscation of his documents for the duration of one meeting deprived him of all means of religious expression.

Accordingly, the Court GRANTS summary judgment in favor of defendants Amos and Espinoza on the First Amendment free exercise claim.

### 2) Establishment Clause

Defendants argue that defendants Amos and Espinoza did not violate plaintiff's rights under the Establishment Clause because the review of, and related confiscation of, plaintiff's documents did not occur in conjunction with any religious service or observation. The Court

agrees. Despite plaintiff's allegations to the contrary, on January 13, 2015, he was on his way to attend a meeting of the ILTAG P.E.A.C.E. Plaintiff was not attending a religious group meeting that night. No religious groups were meeting in the chapel that evening, and P.E.A.C.E. is not a religious group. PBSP's policy of searching inmates' belongings, in particular paper, and retaining the paper for further review has the secular purpose of ensuring prison security, does not have the primary or principal effect of inhibiting the K.A.G.E. religion, and does not foster an excessive entanglement with religion. Accordingly, the Court GRANTS summary judgment in favor of defendants Amos and Espinoza on the Establishment Clause claim.

### 3) Equal Protection Clause

Defendants argue that defendants Amos and Espinoza did not violate plaintiff's rights under the Equal Protection Clause because defendants Amos and Espinoza did not act with discriminatory intent. The Court agrees. It is undisputed that PBSP officials were reviewing all inmates' persons and belongings as they made their way to the chapel, and that it was regular practice to search any documents in an inmate's possession. Plaintiff has not produced evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that defendants Amos and Espinoza' actions were motivated by discriminatory intent, and the search and temporary confiscation of plaintiff's documents were reasonably related to the legitimate penological purpose of ensuring prison security. Accordingly, the Court GRANTS summary judgment in favor of defendants Amos and Espinoza on the Equal Protection claim.

### D. Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "'swiftly and firmly'" in situations where

the rules governing their actions are often "'voluminous, ambiguous, and contradictory.'" *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citing *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.* To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

With respect to the first prong, the Court finds that defendants are entitled to qualified immunity with respect to plaintiff's claims because, as discussed above, there were no constitutional violations. *See Saucier*, 533 U.S. at 201 (defendants prevail on qualified immunity if there was no constitutional violation).

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED. Dkt. No. 74. The Clerk shall enter judgment in favor of defendants and against plaintiff, and close the file.

**IT IS SO ORDERED.**

Dated: 2/26/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge